[Cite as *In re J.P.E.*, 2017-Ohio-1108.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

ADOPTION OF: J.P.E. and A.A.E. : **O P I N I O N**

:

CASE NOS. 2016-T-0113
: 2016-T-0114

Civil Appeals from the Trumbull County Court of Common Pleas, Probate Division. Case Nos. 2016 ADP 0018 and 2016 ADP 0017.

Judgment: Affirmed.

*Elise M. Burkey*, Burkey, Burkey & Scher Co., L.P.A., 200 Chestnut Avenue, N.E., Warren, OH 44483-5805 (For Appellants Brent S. Erb and Amanda L. Erb).

*Brendon J. Kohrs*, Kohrs Law Offices, LLC, 1865 Arndale Road, Suite B, Stow, OH 44224 (For Appellee Amber R. Saltzmann).

TIMOTHY P. CANNON, J.

{¶1}   Appellants, Brent S. Erb and Amanda L. Erb, appeal from the October 20, 2016 judgment of the Trumbull County Court of Common Pleas, Probate Division, which dismissed their petitions to adopt J.P.E. (d.o.b. 1/3/08) and A.A.E. (d.o.b. 8/1/06), upon finding the consent of the natural mother necessary to proceed with the adoptions.  For the following reasons, the trial court's judgment is affirmed.

{¶2}   A hearing on the issue of the natural mother's consent to the adoptions was held on September 19, 2016.  The testimony from the hearing included the following facts:

{¶3} Appellee, Amber R. Saltzmann (a.k.a. Brewer), and her estranged husband, Russell Brewer, are the natural parents of J.P.E. and A.A.E. Both parents struggled with drug abuse and were unable to maintain a stable home. Trumbull County Children Services Board filed a complaint for and received custody of the children in 2012. The children were placed in foster care from approximately March 2012 to August 2013.

{¶4} Around December 2013, temporary custody was granted to Russell Brewer. Russell was arrested for a probation violation in July 2014, and he could no longer care for the children. Members of the First Church of the Nazarene in Warren, who had previously provided assistance to the Brewers, stepped in to care for J.P.E. and A.A.E. Ultimately, Brent Erb, the youth pastor at the church, and his wife Amanda Erb, appellants herein, applied to become the children's foster parents. Their application was granted in 2014. In February 2015, appellants received legal custody of the children; appellee did not appear at the custody hearing.

{¶5} In December 2015, appellee learned her children were associated with the First Church of the Nazarene. Her attempted contacts with appellants were unsuccessful, so on May 8, 2016, she went to the church with her grandparents and fiancé. She had an encounter with Brent Erb and was able to see the children for a short period of time.

{¶6} The following day, on May 9, 2016, appellants filed their petitions for adoption of J.P.E. and A.A.E. The petitions alleged the consent of the natural parents was not necessary, pursuant to R.C. 3107.07(A) because (1) the natural parents failed without justifiable cause to provide more than de minimis contact with the minors for a period of at least one year immediately preceding the filing of the adoption petitions and

2

(2) they failed without justifiable cause to provide for the maintenance and support of the children as required by law or judicial decree for a period of at least one year preceding the filing of the petitions.

{¶7} Appellee filed an objection to the adoptions on June 14, 2016, asserting that a hearing on the necessity of her consent was required because she met the de minimis contact requirement of R.C. 3107.07(A).

{¶8} A hearing on appellants' adoption petitions was held on September 19, 2016. The trial court limited the scope of the hearing to the issue of whether appellee's consent was required. Russell Brewer, who previously consented to the adoptions, did not attend the hearing.

{¶9} The trial court entered judgment on October 20, 2016. It made a factual determination that while appellee failed to provide for the maintenance and support of the children and failed to have more than de minimis contact with the children, there was justifiable cause for her failures. The court determined the consent of the natural mother was necessary to proceed with the adoptions and denied appellants' petitions.

{¶10} On November 21, 2016, appellants filed a timely notice of appeal from the trial court's October 20, 2016 judgment. Appellants assert two assignments of error on appeal:

> [1.] The trial court erred in finding mother's consent was necessary and that her efforts were justifiable cause to fail to support or maintain her children.

> [2.] The trial court erred in finding that mother's failure to have more than de minimis contact was justified.

{¶11} R.C. 3107.07 provides that consent to an adoption is not required of:

3

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶12} The petitioner for adoption has the burden to prove by clear and convincing evidence (1) that the natural parent failed to have more than de minimis contact or failed to provide for the maintenance and support of the child, for the requisite one-year period, and (2) that there was no justifiable cause for the failure. *See In re J.A.B.*, 11th Dist. Trumbull No. 2013-T-0114, 2014-Ohio-1375, ¶28, quoting *In re Bovett*, 33 Ohio St.3d 102 (1987), paragraph one of the syllabus, citing *In re Masa*, 23 Ohio St.3d 163 (1986), paragraph one of the syllabus; *In re M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, fn. 1. Once this is established, "'the burden shifts to the natural parent to show some justifiable reason for the failure.'" *In re M.E.M.*, 11th Dist. Lake No. 2010-L-020, 2010-Ohio-4430, ¶23, quoting *In re Sartain*, 11th Dist. Lake No. 2001-L-197, 2002 WL 448434, *3 (Mar. 22, 2002) (citations omitted). Although the natural parent must come forward with some facially justifiable reason for the failure, the petitioner bears the ultimate burden to prove the natural parent was without justifiable cause for the failure. *See id.* (citations omitted).

{¶13} The probate court engages in a two-step analysis when applying R.C. 3107.07. *In re M.B.,* 131 Ohio St.3d 186, 2012-Ohio-236, ¶23. The first step involves determining the factual question of whether the natural parent failed to provide for the maintenance and support of the child or failed to have more than de minimis contact with the child. *Id.; In re J.R.H.*, 2d Dist. Clark No. 2013-CA-29, 2013-Ohio-3385, ¶25-

4

These findings shall not be disturbed absent an abuse of discretion. *M.B., supra,* at ¶21; *J.R.H., supra,* at ¶26.

{¶14} If the probate court finds the natural parent failed to either provide maintenance and support or to have more than de minimis contact, the second step is for the court to determine whether justifiable cause for the failure has been proven by clear and convincing evidence. *M.B., supra,* at ¶23; *J.R.H., supra,* at ¶27. That determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *M.B., supra,* at ¶24; *J.R.H., supra,* at ¶27.

{¶15} To determine whether the trial court's judgment is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the ""[finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶19-20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001), quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶21.

{¶16} In their second assignment of error, appellants argue the trial court erred in finding appellee's failure to have more than de minimis contact with her children was justified.

{¶17} "'Ohio courts have held that justification of a parent's failure to communicate with his or her child is shown when there has been "significant interference" with a parent's communication with a child or "significant discouragement"

5

of such communication.'" *M.E.M.*, *supra*, at ¶29, quoting *In re KR.E., K.E., & A.E.*, 9th Dist. Lorain No. 06CA008891, 2006-Ohio-4815, ¶21, citing *In re Holcomb*, 18 Ohio St.3d 361 (1985), paragraph three of the syllabus.

{¶18} At the September 19, 2016 hearing, appellee testified that after Russell Brewer obtained temporary custody of the children in December 2013, she moved, went through some personal struggles, and lost contact with Russell and the children. Once appellee got settled again, she began to look for Russell and her children. She did not locate her children until December 2015, when she learned the children were affiliated with the First Church of the Nazarene.

{¶19} Upon learning this information, appellee testified she checked the church's website and saw an announcement about the birth of appellants' new child, congratulating appellants and J.P.E., and A.A.E. Appellee testified she did not have appellants' street address, so she contacted the pastor of the First Church of the Nazarene to inquire whether he would talk to appellants on her behalf. She left messages for the pastor, but he did not return her calls.

{¶20} Appellee also left a Facebook message for Amanda Erb. She left the message through her fiancé's Facebook page but identified herself by name and as the mother of J.P.E. and A.A.E. She also left more than ten comments on Facebook under pictures of her children, saying "I would like to get ahold of you and see my children and meet you so we can get things figured out." Brent Erb testified, in reference to the comments left under pictures of the children, that "[o]ne of those statements was that this whole situation was handled all wrong and we need to see the kids right away. Now, I don't know that those are the exact words. I'm just remembering." Appellee

6

received no response from appellants on Facebook, and Amanda Erb subsequently blocked her on Facebook.

{¶21} Appellee's grandmother, Arlene Saltzmann, testified that she contacted the pastor at the First Church of the Nazarene, requesting that he set up a meeting with appellants and the children so that she and her husband could give the children gifts. The church's pastor expressed that he would look into it but never got back to Mrs. Saltzmann. Brent Erb testified that the pastor notified him of Mrs. Saltzmann's contact.

{¶22} Appellee's fiancé, Ryan Grifa, testified that he sent Brent Erb a message through Facebook on April 30, 2016. The message explained who he was, his relation to appellee, and appellee's struggle to find her children. The message expressed that Mr. Grifa "want[ed] to get this thing resolved." The message came back as read, he received no response, and Brent Erb blocked him on Facebook, preventing Mr. Grifa from sending further messages. Brent Erb testified that he received two contacts from Mr. Grifa, one Facebook comment under a picture of the children and the Facebook Messenger contact of April 30, 2016. He did not respond to the messages because, although he and his wife knew appellee's name, they were unsure of Mr. Grifa's identify and, after some research, found he had a criminal history.

{¶23} Appellee testified that on May 8, 2015, after she was unable to make contact with appellants through Facebook or the church's pastor, she went to the church with her fiancé and grandparents. They came into contact with appellant Brent Erb and the children. Appellee was able to see her children for a short period of time. Brent Erb testified that after approximately 10 to 15 minutes of visiting with appellee and her family, he directed the children to go into the gym because appellee and her family began talking about appellee's past struggles of trying to find the children. Appellee

7

testified that when she asked Brent Erb about the contacts on Facebook, he expressed "he didn't feel [social media contact] was appropriate and that we had to go through court." Brent Erb testified that during this encounter he indicated to appellee that they could work out visitation through the court.

{¶24} Appellants maintain that for over four years appellee did not make any effort to pursue the available legal avenues to find her children. Appellants argue that because appellee did not contact the Trumbull County Juvenile Court or the Trumbull County Children Services Board to try and find her children, she was not justified in failing to have more than de minimis contact with them.

{¶25} Under R.C. 3107.07(A), an adoption may proceed without consent if the natural parent has failed to have more than de minimis contact with the child "for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner." Here, the trial judge determined the relevant look-back period, for purposes of R.C. 3107.07(A), was May 9, 2015, through May 9, 2016, one year immediately preceding the filing of the adoption petition.

{¶26} In determining whether a natural parent's failure to have more than de minimis contact was justified, the central question is whether there was a significant interference with visitation and communication and not whether it was possible for the natural parent to have done more to overcome the interference with visitation and communication. *See In re S.B.D.*, 2d Dist. Miami No. 2006-CA-25, 2006-Ohio-5133, ¶37. Although we acknowledge appellee could have contacted the court or Children Services in an effort to locate her children, she did not. Whether she could have found the children sooner is not the issue. It is clear that once appellee did find the children,

8

she made repeated attempts through multiple channels to communicate with them. There is ample evidence that would allow the trial court to find appellants significantly interfered with or discouraged the several contacts appellee and her family attempted to make. Appellee was not required to do more to overcome appellants' interference with her attempts.

{¶27} Appellants further argue that "blocking" on Facebook should be of no substantive value with regard to significant interference with or discouragement of the natural parent's contacts. Appellants cite to the Third Appellate District case of *In re K.C.*, 3d Dist. Logan No. 8-14-03, 2014-Ohio-3985 in support of their position.

{¶28} This case is factually distinguishable from *In re K.C.* In that case, the natural father of the minor child objected to the child's adoption by the natural mother's husband. *Id.* at ¶6. The adoption petition, which was filed on December 1, 2012, alleged the natural father's consent to the adoption was unnecessary because he failed without justifiable cause to have more than de minimis contact with the minor child. *Id.* at ¶4. At the adoption hearing, the child's mother testified that the natural father had last seen the child after she had reached out to him and arranged the visitation. *Id.* at ¶9. She testified that the natural father had her contact information but did not call to arrange visitation or speak with the child. *Id.* at ¶9-10. The natural father contacted the mother on Facebook on November 30, 2012, and December 1, 2012, but did not ask about the child. *Id.* at ¶9. After receiving the messages, the child's mother blocked the natural father on Facebook. *Id.*

{¶29} The trial court found the natural father's November 30, 2012 Facebook contact was de minimis. *Id.* at ¶17. It found the father failed, without justifiable cause, to have more than de minimis contact with the child, stating, "the Mother's 'unfriending'

9

of the father on Facebook on December 1, 2012 holds no substantive value." *Id.* The trial court found the natural father had numerous resources to facilitate contact with his child, but he did not pursue any of them. *Id.* The natural father contacted the mother twice on Facebook, and her blocking him was not significant. On appeal, the Third District affirmed the trial court's decision, stating it was not persuaded that the mother's "act of blocking [the natural father] from her Facebook page * * * [was] sufficient to alter in any way the trial court's evaluation of the evidence" on the issue of justifiable cause. *Id.* at ¶30.

{¶30} Here, appellee did not have contact information for appellants or her children. When she found appellants and her children, she attempted several contacts through Facebook and other means. Unlike *In re K.C.*, appellee continued to make alternative efforts to contact the children after Facebook attempts were thwarted. As the trial court found, those efforts were also met with significant interference and discouragement.

{¶31} The trial court found appellee's failure to have more than de minimis contact with her children was justified because appellee did not know where her children were for most of the year in question and appellants significantly interfered with or discouraged her attempts to make contact. The trial court found appellants blocked appellee's and her family's attempts to contact appellants and the children through the church and through Facebook. The trial court also found that when appellee went to the church to see her children, the length of the visit was abbreviated because appellants viewed the attempt at contact as inappropriate.

{¶32} The trial court's judgment concerning justification for failure to maintain more than de minimis contact is not against the manifest weight of the evidence. There

is evidence that supports the trial court's findings that the interference and discouragement by appellants prevented appellee's attempts to restore communication with her children.

**{¶33}** Appellants' second assignment of error is without merit.

**{¶34}** In their first assignment of error appellants argue the trial court's finding that appellee failed without justifiable cause to provide for the maintenance and support of her children was against the manifest weight of the evidence.

**{¶35}** "Both common and statutory law in Ohio mandate that a parent provide sufficient support for his or her child." *Haskins v. Bronzetti*, 64 Ohio St.3d 202, 205 (1992). However, a zero support or no support order relieves a parent of his or her obligation to provide support of any kind. *In re A.N.W. & L.D.W.*, 7th Dist. Belmont No. 15 BE 0071, 2016-Ohio-463, ¶29 (citations omitted). A zero support order or no support order differs from the absence of a support order. *Id.* at ¶30. "When a court is silent on support or has not entered an order regarding support, that fact alone does not constitute justifiable cause for failing to provide support and maintenance." *Id.* (citations omitted). However, "a natural parent is not obligated to provide support where the person in custody of the child is advised of the parent's financial condition and expresses no interest in receiving financial assistance." *In re J.A.B.*, 11th Dist. Trumbull No. 2013-T-0114, 2014-Ohio-1375, ¶44 (citations omitted).

**{¶36}** Appellants argue that appellee's failure to provide maintenance and support was not justified because she had the means to offer support but did not. Appellants maintain appellee was "employed, had income, had another child, and yet could not make the effort to attempt to see her children, nor pay support, for over four years."

11

{¶37} At the hearing, Brent Erb testified that when he and his wife received custody of the children, the trial court did not issue a support order to the natural parents. He also testified that there was not a zero support or no support order. He testified that he and his wife had not received any support from appellee since they obtained custody of the children. He further stated that the children are on his and his wife's health insurance.

{¶38} Appellee testified that she did not pay any money for the support of the children and was never asked for support. Appellee testified that she has worked at "Easy Wins," an internet sweepstakes café, for over a year. Prior to that she cleaned houses on and off for two years but had to stop working when she became pregnant with her third child, which was a high risk pregnancy, and had pregnancy complications. Aside from appellee's testimony about her employment history, no evidence of appellee's financial ability to support her children was entered into evidence. Appellants failed to establish appellee was financially able to support her children but willfully refused to do so.

{¶39} There was differing testimony with regard to the money offered by appellee and her family at the May 8, 2016 encounter. Appellee and her fiancé, Mr. Grifa, testified that during the encounter they offered Brent Erb approximately $280 to support the children. They testified that Brent Erb refused their gift of money and expressed that it was more appropriate to go through the court. Brent Erb testified that he had no recollection of appellee and Mr. Grifa offering any money. The trial judge was in the best position to determine the credibility of the witnesses and was entitled to believe the testimony of appellee and Mr. Grifa over Brent Erb.

{¶40} Appellee, her grandmother, and Mr. Grifa all testified that at the May 8 encounter, Mrs. Saltzmann and her husband offered to give the children gifts they had been saving for them over three years. Brent Erb conceded that appellee's grandparents had offered to give the children gifts. Appellee testified that Brent Erb refused the gifts.

{¶41} The trial court found that appellee's failure to provide for the maintenance and support of the children was justified because she did not know where her children were for most of the one-year period in question, and when she learned of the whereabouts of the children she still did not know their physical address. The court further found that due to appellants' interference in appellee's communication efforts, she had no ability to discuss where to send gifts or money. The trial court found that the encounter at the church was the only genuine opportunity appellee had to provide any support to her minor children while they were in the care of appellants. There was testimony that appellee's family brought gifts, and appellee and her fiancé testified that they offered money, both of which were refused by appellants.

{¶42} The record supports the trial court's findings that appellee did not know the address of her children in order to send gifts or money. Additionally, although the trial court had not issued a support order, when appellee and her family offered gifts and money at the May 8 encounter, those efforts at providing support were refused by Brent Erb. Therefore, the trial court's finding that appellee's failure to provide for the maintenance and support of her children was justified is not against the manifest weight of the evidence.

{¶43} Appellants' first assignment of error is without merit.

{¶44}  For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas, Probate Division, is affirmed.


COLLEEN MARY O'TOOLE, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.


_____


DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.


{¶45}  I respectfully dissent and would reverse the decision of the probate court finding that the consent of the biological mother was necessary to proceed with the adoption of J.P.E. and A.A.E.  For a period of more than three years prior to the filing of the adoption petition the biological mother had only de minimis contact with her children – a single encounter and no support provided.  Just as significant, the biological mother's efforts to contact her children were de minimis.  To find that her paltry efforts were frustrated by "significant interference" from the custodial parents, as required by the Ohio Supreme Court, is contrary to any fair interpretation of the evidence.

{¶46}  "Pursuant to R.C. 3107.07(A), the petitioner for adoption has the burden of proving, by clear and convincing evidence, both (1) that the natural parent has failed to support the child for the requisite one-year period, and (2) that this failure was without justifiable cause."  *In re Bovett*, 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph one of the syllabus.  "Significant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's

14

failure to communicate with the child." *In re Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985), paragraph three of the syllabus.

{¶47} Children services took custody of the children from the biological mother in 2012. She was present at a hearing when custody was granted to the biological father in 2013. She "did not go to any further court hearings after that" and did not provide children services with current addresses. Although she faults the Erbs for blocking her, or rather her fiancé, on Facebook, the biological mother refused to provide even her grandmother with a current address because she wanted "to protect my privacy."

{¶48} It should be recognized that, at any time after 2012, the mother could have contacted either children services or the juvenile court to determine the children's whereabouts and establish visitation or even provide support. These fundamental steps were never taken. For "justifiable cause," the biological mother offered that children services would not talk to her on the phone because "they don't like me * * * basically, and they treated me like crap."

{¶49} There is no real testimony regarding efforts by the biological mother to contact her children after custody of the children was given to the biological father until, sometime after December 2015, "somebody told me that they knew where the kids were."

{¶50} At this point, the biological mother had her grandmother (the children's great-grandmother) contact the pastor of the church that the Erbs and the children attended. The grandmother contacted the pastor of the church beginning in January 2016 and left several messages. The biological mother also claimed to leave messages. According to the grandmother, the pastor returned her calls on February 29. She indicated that she and the biological mother would like to meet with the children

15

and the Erbs.  The pastor replied that he would see what he could do.  There was no further contact with the pastor.

**{¶51}** It should be recognized that the evidence regarding efforts to contact the children through the pastor of the church they attend has no relevance at all to the issue of whether the Erbs significantly interfered with communication between the biological mother and the children.

**{¶52}** The biological mother further testified that she began posting comments on Facebook pictures of the children indicating that she would like to meet with the Erbs and "get things figured out" with respect to the children.  These comments or messages were posted through her fiancé, Ryan Grifa's, Facebook page.  She admitted that the Erbs had no reason to know who Ryan Grifa was.

**{¶53}** Grifa testified that he sent a detailed message to the Erbs on April 30, 2016 (one week before the sole contact between the biological mother and the children), explaining who he was and that the biological mother wanted to have contact with the children.  The Erbs blocked him from their Facebook page.  In Grifa's words, the Erbs "shunned" them.

**{¶54}** Brent Erb testified he and his wife have had custody of the children since 2014.  He testified that he did not know the biological mother by her physical appearance and did not know who Grifa was, although he was able to determine that Grifa had a criminal history.  He blocked further Facebook contact with Grifa out of concern for the children's safety.  Erb acknowledged that in March 2016, the pastor had advised him that the children's great-grandmother had contacted him about visiting the

children, but no mention was made of the biological mother. Until meeting her at the church, he had never had direct contact with the biological mother.[1]

{¶55} On May 8, 2016, the biological mother took what the probate court described as "the extraordinary step of traveling to the church to try to make contact" with the children. I respectfully disagree that there was anything "extraordinary" about this action. If the mother had bothered to drive to children's services or juvenile court she would have been able to reestablish contact with her children years ago. Nor is there anything extraordinary about having one's grandmother and fiancé make efforts on one's behalf.

{¶56} The determinative issue is whether the Erbs did anything that could be construed as significantly interfering with the biological mother's communication with the children. They did not. Blocking a stranger with a criminal history from your Facebook page is not significant interference with the biological mother's communication.[2] Not responding to the maternal great-grandmother's inquiry about the children made through a third party is not significant interference with the biological mother's communication. Beyond this, there is nothing in the record to support the probate court's finding of significant interference or this court's affirmance of that finding. *In re Smith*, 3d Dist. Allen No. 1-98-54, 1999 WL 181186, 4 (Mar. 12, 1999) (the petitioner's failure to "make any overt effort to foster or encourage communication between [the biological parent] and the child" does not constitute substantial interference).

{¶57} For the forgoing reasons, I respectfully dissent.

---

1. Notably, when the biological mother introduced herself at the church, the Erbs (according to Grifa's testimony) were "polite" and "let us talk to the kids, let my daughter meet her brother and sister. And * * * we were there for about an hour."

2. The majority's discussion of *In re K.C.*, 3d Dist. Logan No. 8-14-03, 2014-Ohio-3985, overlooks the crucial point that, in *K.C.*, it was the biological parent attempting to make contact by Facebook, not, as in this case, the biological parent's significant other.

17