[Cite as *In re Adoption of J.F.*, 2020-Ohio-5132.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:  THE ADOPTION OF:

    J.F.

[TRAVIS L. FARSON - APPELLANT]

CASE NO. 5-20-06

O P I N I O N

IN RE:  THE ADOPTION OF:

    A.F.

[TRAVIS L. FARSON - APPELLANT]

CASE NO. 5-20-07

O P I N I O N

**Appeals from Hancock County Common Pleas Court**
**Probate Division**
**Trial Court Nos. 20195022 and 20195023**

**Judgments Affirmed**

**Date of Decision:   November 2, 2020**

**APPEARANCES:**

    *Linda S. Holmes* **for Appellant**

Case Nos. 5-20-06, 5-20-07

**ZIMMERMAN, J.**

{¶1} Petitioner-appellant, Travis L. Farson ("Travis"), appeals the January 10, 2020 decision of the Hancock County Court of Common Pleas, Probate Division, concluding that the consent of respondent-appellee, Joshua Shank ("Joshua"), to Travis's petitions to adopt J.F. and A.F. (collectively "the children") is required. For the reasons that follow, we affirm.

{¶2} J.F. was born in July 2010 and A.F. was born in October 2011 to Joshua and Shaylynne Elizabeth Myers nka Farson ("Shaylynne"). (Case No. 20195022, Doc. No. 1); (Case No. 20195023, Doc. No. 1). Joshua was listed as the father on both J.F.'s and A.F.'s birth certificates.[1] (Case No. 20195022, Doc. No. 4); (Case No. 20195023, Doc. No. 4); (Petitioner's Exs. 2, 3). Joshua and Shaylynne resided together, off and on, until they separated in 2016. (Dec. 16, 2019 Tr. at 32, Doc. No. 23).

{¶3} Shaylynne and Travis were married in 2017. (Case No. 20195022, Doc. No. 1); (Case No. 20195023, Doc. No. 1). On May 2, 2019, Travis filed petitions to adopt J.F. and A.F. in the trial court.[2] (*Id.*); (*Id.*). In his petitions, Travis asserts that Joshua's consent to the adoptions is not required because Joshua "failed without

---

[1] Initially, Joshua was not listed as the father on A.F.'s original birth record. (Case No. 20195023, Doc. No. 4). It was not until a request for the establishment of a child-support order in Hancock County Court of Common Pleas, Juvenile Division ("HCCPC-JD"), that a parent-child relationship was established between Joshua and A.F. through genetic testing, ultimately, resulting in the issuance of a new birth record under R.C. 3111.18. (Dec. 16, 2019 Tr. at 15). (*See* Case No. 20195023, Doc. No. 4); (Petitioner's Ex. 3).

[2] At the time of the filing of Travis's petition, Shaylynne had pending litigation in HCCPC-JD as to custody and child-support matters involving both J.F. and A.F. in case number 21140228. (Case No. 20195022, Doc. No. 1); (Case No. 20195023, Doc. No. 1). (*See* Petitioner's Ex. 6).

justifiable cause to provide more than de minimis contact with [each of] the minor [children] for a period of at least one year immediately preceding the filing of the adoption petition[s]". (Case No. 20195022, Doc. No. 1); (Case No. 20195023, Doc. No. 1). Shaylynne consented to Travis's adoption of the children on April 29, 2019. (Case No. 20195022, Doc. No. 3); (Case No. 20195023, Doc. No. 3). The one-year "look back" period as to Joshua's contact with the children at the issue in these adoptions is May 3, 2018 to May 2, 2019.

{¶4} On May 30, 2019, Joshua filed *pro se* letters requesting the trial court stop the adoptions on the basis that he had been denied access to the children for a two-year period. (Case No. 20195022, Doc. No. 13); (Case No. 20195023, Doc. No. 12). On July 3, 2019, the trial court vacated the adoption hearing scheduled on July 9, 2019 and rescheduled the matter for a "consent not required" hearing on September 16, 2019. (Case No. 20195022, Doc. No. 14); (Case No. 20195023, Doc. No. 13). After conducting a hearing, the trial court filed its entry on January 10, 2020 concluding that justifiable cause exists for Joshua's failure to provide more than de minimus contact with the children and ordered that Joshua's consent was required for the adoptions to proceed. (Case No. 20195022, Doc. Nos. 16, 17); (Case No. 20195023, Doc. Nos. 15, 16).

{¶5} Travis filed his notice of appeal in each case on February 3, 2020. (Case No. 20195022, Doc. No. 17); (Case No. 20195023, Doc. No. 16). We have

Case Nos. 5-20-06, 5-20-07

consolidated these cases for purposes of our review. (Case No. 5-20-07, JE Feb. 13, 2020). He raises one assignment of error in each appeal.

**Assignment of Error**

**The Trial Court's Finding There Was Justifiable Cause For Appellee's Failure To Have More Than *De Minimus* Contact With J.F. and A.F. Was Against The Manifest Weight Of The Evidence.**

{¶6} In his assignment of error, Travis argues that the trial court erred by concluding that Joshua's consent to Travis's petitions for adoption is required. In particular, Travis argues that the trial court erred by concluding that Joshua had justifiable cause for failing to provide more than de minimis contact with his children for one year immediately preceding the filing of the adoption petitions, and that such determination is against the manifest weight of the evidence.

{¶7} Initially, we note that Joshua failed to file a brief in either case. The Ohio Rules of Appellate Procedure state in pertinent part that:

> [i]f an appellee fails to file the appellee's brief within the time provided by this rule, or within the time as extended, the appellee will not be heard at oral argument * * * and in determining the appeal, the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action.

App.R. 18(C); *Haldy v. Hoeffel*, 3d Dist. Henry No. 7-17-02, 2017-Ohio-8786, ¶ 9, citing App.R. 18(C) and *State v. Young*, 3d Dist. Seneca No. 13-03-52, 2004-Ohio-540, ¶ 4. However, upon our review of the record, we find that the appellant's brief

does not reasonably appear to sustain a reversal of the trial court. Thus, we will examine appellant's assignment of error.

*Standard of Review*

**{¶8}** "'Ordinarily, the written consent of a minor child's natural parents is required prior to adoption, but R.C. 3107.07 provides exceptions to this requirement.'" *In re Adoption of H.R.*, 3d Dist. Logan No. 8-14-15, 2014-Ohio-5390, ¶ 23, quoting *In re Adoption of K.C.*, 3d Dist. Logan No. 8-14-03, 2014-Ohio-3985, ¶ 20. Specifically, R.C. 3107.07 states:

> **{¶9}** Consent to adoption is not required of any of the following:
>
> (A)  A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

R.C. 3107.07(A). "'R.C. 3107.07(A) is written in the disjunctive.'" *In re Adoption of H.R.* at ¶ 23, quoting *In re Adoption of K.C.* at ¶ 21. "'Therefore, a failure without justifiable cause to provide *either* more than de minimis contact with the minor *or* maintenance and support for the one-year time period is sufficient to obviate the need for a parent's consent.'" (Emphasis sic.) *Id.*, quoting *In re Adoption of K.C.* at ¶ 21, citing *In re Adoption of A.H.*, 9th Dist. Lorain No. 12CA010312, 2013-Ohio-1600, ¶ 9.

{¶10} "Because cases such as this one may involve the termination of fundamental parental rights, the party petitioning for adoption has the burden of proving, by clear and convincing evidence, that the parent failed to provide more than de minimis contact with the minor or failed to provide for the maintenance and support of the minor during the requisite one-year period and that there was no justifiable cause for the failure." *Id.* at ¶ 24, citing *In re Adoption of K.C.* at ¶ 24, citing *In re R.L.H.*, 2d Dist. Montgomery No. 25734, 2013-Ohio-3462, ¶ 9. "'"Once the petitioner has established this failure, the burden of going forward shifts to the parent to show some facially justifiable cause for the failure. * * * The burden of proof, however, remains with the petitioner."'" *Id.*, quoting *In re R.L.H.* at ¶ 9, quoting *In re A.N.B.*, 12th Dist. Preble No. CA2012-04-006, 2012-Ohio-3880, ¶ 10.

> 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'

*Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus, and citing *In re Adoption of K.C.* at ¶ 24.

*Analysis*

{¶11} "'The Supreme Court of Ohio has articulated a two-step analysis for probate courts to employ when applying R.C. 3107.07(A).'" *Id.* at ¶ 25, quoting *In re Adoption of K.C.* at ¶ 23, citing *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-

Ohio-236, ¶ 23. "The first step involves deciding a factual question—in this case, whether the parent failed to provide more than de minimis contact with the minor or failed to provide for the maintenance and support of the minor for a period of at least one year immediately preceding the filing of the adoption petition." *Id.*, citing *In re Adoption of K.C.* at ¶ 23, citing *In re R.L.H.* at ¶ 12, citing *In re Adoption of M.B.* at ¶ 23. *See also In re Adoption of S.J.M.H.*, 1st Dist. Hamilton No. C-130683, 2014-Ohio-3565, ¶ 29. """A trial court has discretion to make these determinations, and in connection with the first step of the analysis, an appellate court applies an abuse-of-discretion standard when reviewing a probate court decision * * *.""" *Id.*, quoting *In re Adoption of K.C.* at ¶ 23, quoting *In re Adoption of M.B.* at ¶ 25. *See also In re Adoption of S.J.M.H.* at ¶ 29. "In the second step of the analysis, if a probate court finds the parent failed to provide more than de minimis contact or failed to provide for the maintenance and support of the minor, the court then determines 'whether justifiable cause for the failure has been proved by clear and convincing evidence.'" *Id.*, quoting *In re Adoption of M.B.* at ¶ 23. *See also In re Adoption of K.C.* at ¶ 23. "'A probate court's decision on whether justifiable cause exists will not be disturbed on appeal unless the determination is against the manifest weight of the evidence.'" *Id.*, quoting *In re Adoption of K.C.* at ¶ 23, citing *In re Adoption of M.B.* at ¶ 24 and *In re Adoption of Masa*, 23 Ohio St.3d 163 (1986), paragraph two of the syllabus.

'In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" that there must be a reversal of the judgment and an order for a new trial.'

*In re Adoption of N.T.R.*, 10th Dist. Franklin No. 16AP-589, 2017-Ohio-265, ¶ 11, quoting *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA 35, 2014-Ohio-1276, ¶ 18, quoting *Steagall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4671, ¶ 29.

{¶12} We begin by addressing the first step of the analysis applying the appropriate standard of review—that is, whether the trial court abused its discretion by finding that Travis proved that Joshua failed to provide more than de minimis contact with J.F. and A.F for the one year period in question.  Our review of the record reveals that Joshua stipulated that he has had no contact with the children since March 2017.  (Dec. 16, 2019 Tr. at 23, Doc. No. 23).  Moreover, the trial court determined, "[a]ll parties in this case agree that [Joshua] has not had contact with the children for the one year time period prior to the filing of the petition."  (Case No. 20195022, Doc. No. 16); (Case No. 20195023, Doc. No. 15).  As such, we cannot say that the trial court abused its discretion in concluding that Travis proved that Joshua failed to have more than de minimis contact with the children for one year immediately preceding the filing of the adoption petitions.

{¶13} Next, we turn to the second step of the analysis, that being the trial court's conclusion that justifiable cause existed for Joshua's failure to have de minimus contact with the children.  "'""Ohio courts have held that justification of a parent's failure to communicate with his or her child is shown when there has been 'significant interference' with a parent's communication with a child or 'significant discouragement' of such communication."'"  *In re J.P.E.*, 11th Dist. Trumbull No. 2016-T-0113 and 2016-T-0114, 2017-Ohio-1108, ¶ 17, quoting *In re M.E.M.*, 11th Lake No. 2010-L-020, 2010-Ohio-4430, ¶ 29, quoting *In re Kr.E., K.E., & A.E.*, 9th Dist. Lorain No. 06CA008891, 2006-Ohio-4815, ¶ 21, citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985), paragraph three of the syllabus.  "In determining whether a natural parent's failure to have more than de minimis contact was justified, the central question is whether there was a significant interference with visitation and communication and not whether it was possible for the natural parent to have done more to overcome the interference with visitation and communication." *Id.* at ¶ 26, citing *In re S.B.D.*, 2d Dist. Miami No. 2006-CA-25, 2006-Ohio-5133, ¶ 37.

{¶14} As to our review of the trial court's finding that justifiable cause exits for Joshua's failure to provide more than de minimus contact, we need to decide whether such finding is against the manifest weight of the evidence adduced at trial. Thus, we start with a review of the testimony of the witnesses.

**{¶15}** Travis called Joshua as his first witness (as if on cross-examination) in his case in chief. (Dec. 16, 2019 Tr. at 8). Joshua testified that he and Shaylynne were the parents of J.F. and A.F., and they had a supervised-parenting-time order, but that they did not follow the order because they lived together after the order was established. (*Id.* at 13-14, 28-29). According to Joshua, they lived together as a couple from 2013 through September 2016 when he moved out to reside with his mother. (*Id.* at 32). Nevertheless, Joshua testified that he and Shaylynne maintained a sexual relationship after he moved out, and that he would routinely come over to eat dinner with Shaylynne (and the children) until their final break up in March 2017. (*Id.*). Joshua testified that after Shaylynne broke off the relationship, he was homeless for approximately a year. (*Id.* at 11).

**{¶16}** Joshua further testified that he had no way to receive mail (due to being homeless) and that Shaylynne had changed her address, phone number, and blocked him on Facebook.[3] (*Id.*). According to Joshua, when he attempted to contact Shaylynne through mutual friends, Shaylynne would block those friends. (*Id.* at 17). Joshua testified he was unable to send letters or birthday cards to the

---

[3] "Blocking" is a Facebook term used to designate a Facebook member's limitation of access to their Facebook profile by obstructing another member from being able to "tag" (or create a link to the blocking member's profile) for status updates, to say who the member is with, or for content uploaded to Facebook by that member. Facebook Help Center, *What is blocking on Facebook and how do I block someone?*, https://www.facebook.com/help/168009843260943 (accessed Sept. 15, 2020). Moreover, blocking precludes the blocked member from seeing posts on the blocking-member's-profile timeline or their posts on the timeline of other Facebook members, inviting the blocking member to events or groups, starting a conversation with the blocking member, or adding the blocking member as a "friend". *Id.* A Facebook member may block another member regardless of whether they are identified as "friends" on Facebook; however, if they are friends prior to blocking, they will be "unfriended" as a result of being blocked by that member. *Id.*

children because he did not know where Shaylynne lived. (*Id.* at 21-23). Moreover, even if he did, he testified there was a power imbalance in their relationship, and Shaylynne would frequently use it to her advantage by threatening to call law enforcement on Joshua. (*Id.* at 21-23, 27, 30-33).

{¶17} Next, Travis testified in support of his adoption petitions. (*Id.* at 36). Travis testified that he started dating Shaylynne in April 2017, and they were married on October 14, 2017. (*Id.* at 36). Travis testified that while he blocked Joshua on his Facebook account he did not block him on his cell phone. (*Id.* at 42). Nevertheless, Travis testified that Joshua possessed Shaylynne's cell-phone number. (*Id.* at 42-43). Travis denied blocking Joshua's family members from his Facebook account or phone. (*Id.* at 43-44).

{¶18} Shaylynne also testified on behalf of Travis's petitions for adoption. (*Id.* at 46-47). Shaylynne testified that the last time that Joshua saw their children was in March 2017. (*Id.* at 51). Shaylynne testified that she and Travis blocked Joshua in April 2017 "for trying to interfere with [her] relationship." (*Id.* at 53). According to Shaylynne, she did not block Joshua's family members from her cell phone. (*Id.* at 54). Shaylynne further testified that she was contacted by Joshua's sister, Latosha Shank ("Latosha"), in 2018 requesting her to permit the children attend a family-birthday party. (*Id.* at 55). Shaylynne testified she was not comfortable with that request and did not permit the children to attend the party.

(*Id.*). Importantly, Latosha sent Shaylynne a friend request on Facebook that she did not accept. (*Id.*).

{**¶19**} Shaylynne further testified that she changed her cell-phone number sometime around October 2017. (*Id.* at 58). According to Shaylynne, even if Joshua had asked to see the children she would have refused his request because she claimed he was physically abusive. (*Id.* at 62). She testified that the only way she would have allowed him visitation was under the supervision of Joshua's mother— the children's paternal grandmother. (*Id.*).

{**¶20**} Travis's next witness was Bruce Arlen Myers ("Bruce"). (*Id.* at 65). Bruce testified that he is Shaylynne's father, and that he has resided at his current address for 32 years. (*Id.* at 66). According to Bruce, Travis and Shaylynne moved into their current residence in the spring or summer of 2019. (*Id.* at 67). He testified that he does have a social-media account, but has never blocked Joshua or any of Joshua's family members from his account. (*Id.* at 67-68).

{**¶21**} Travis's last witness was Andrea Deuble ("Andrea"), Shaylynne's sister. (*Id.* at 69). She testified that she has a social-media account and that she (Andrea) has never blocked Joshua or any of his family members from her account or from her cell phone. (*Id.* at 71-72).

{**¶22**} After Travis rested his case, Joshua called his sister, Latosha Shank ("Latosha") as his first witness. (*Id.* at 74-75). She testified that Joshua has never been abusive to his children. (*Id.* at 76-77). Latosha testified that Shaylynne has

blocked her from her social-media account. (*Id.* at 78). Nonetheless, Latosha reached out to Shaylynne several times attempting to get Shaylynne to permit the children to attend their cousins' birthday parties or playdates. (*Id.*). Latosha further testified that she has told Shaylynne several times that she and Joshua need to be able to co-parent the children, and that Shaylynne could have moved on with her life without alienating the children from Joshua. (*Id.*).

{¶23} On cross-examination, Latosha testified that Shaylynne routinely broke up with Joshua (when they were together) frequently by kicking him out of their residence, but would permit him to return when she needed help with the children. (*Id.* at 80). Latosha testified that prior to the break-up (of Joshua and Shaylynne) she was able to reach out to Shaylynne on her social-media account, but after the break-up in 2017, she was blocked. (*Id.*).

{¶24} Joshua called Diane Nottingham ("Diane") as his next witness. (*Id.* at 82). Diane testified that she saw Shaylynne and the children sometime in 2017 at the mall. (*Id.* at 84). Shaylynne began whispering and walked away. (*Id.*). Diane testified that Shaylynne's used Joshua as her personal babysitter when they were a couple and when they broke up she denied him access to the children. (*Id.* at 85). Diane testified that she was blocked on Shaylynne's social-media account until recently, and that she was unable to contact Shaylynne because she did not have her current cell-phone number. (*Id.*).

{¶25} On cross-examination, Diane testified that she has been blocked on Facebook since 2017 or 2018, and that, she regularly checks to see if she can access Shaylynne's social-media profile. (*Id.* at 86). She also testified that Shaylynne blocked her husband (on Facebook) as well even though they did not converse or have a relationship. (*Id.*). However, according to Diane, her husband is no longer blocked from Shaylynne's social-media account at the present time. (*Id.*).

{¶26} Joshua called Phillip Nottingham ("Phillip") as his next witness. (*Id.* at 87-88). Phillip testified that he has never seen Joshua be abusive with his children. (*Id.* at 88).

{¶27} Joshua called Nicole Stewart as his final witness. (*Id.* at 90-91). Nicole testified that she has witnessed Joshua attempting to access Shaylynne's and Travis's social-media profiles of which he is blocked. (*Id.* at 91).

{¶28} With no further evidence being introduced, the trial court determined that while "[i]t is concerning that [Joshua] never filed a motion in court to address visitation" * * * what is "more concerning are the extreme efforts that [Shaylynne] has gone to keep [Joshua] from having any contact with the children." (Case No. 20195022, Doc. No. 16); (Case No. 20195023, Doc. No. 15).

{¶29} Based upon our review of the record, we conclude that the trial court's determination that justifiable cause exits for Joshua's failure to provide more than de minimis contact with his children is not against the manifest weight of the

evidence. Specifically, we cannot say that the trial court lost its way and created such a manifest miscarriage of justice.

{¶30} In our review, it is clear that the trial court determined the issue of justifiable cause based on the credibility of the witnesses. Indeed, Shaylynne's explanation of Joshua's lack of contact with the children is ultimately a credibility determination, which is left to the sound discretion of the trial court. "'A trial court is "free to believe all, part, or none of the testimony of any witness who appears before it."'" *In re Adoption of K.C.*, 2014-Ohio-3985, at ¶ 26, quoting *In re Adoption of M.C.*, 4th Dist. Jackson No. 11CA5, 2011-Ohio-6527, ¶ 19, quoting *Rogers v. Hill*, 124 Ohio App.3d 468, 470 (4th Dist.1998). *See also In re J.P.E.*, 2017-Ohio-1108, at ¶ 39 ("The trial judge was in the best position to determine the credibility of the witnesses and was entitled to believe the testimony of appellee and Mr. Grifa over Brent Erb."). As such, we conclude that the evidence supporting that Shaylynne significantly interfered with Joshua's communication and visitation with the children is weightier than the evidence that she did not.

{¶31} Accordingly, the trial court's determination that the failure of Joshua to provide more than de minimis contact with the children was justified is not against the manifest weight of the evidence.

{¶32} For the foregoing reasons, we hold that the trial court did not err in concluding that Joshua's consent to Travis's adoption of J.F. and A.F. is required under R.C. 3107.07(A).

-15-

**{¶33}** Travis's assignment of error is overruled.

**{¶34}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**